**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 13** |
| | : | |
| **Donald Robert Gurnari,** | : | **Case No. 5:23-01232–MJC** |
| **Sharon A. Gurnari,** | : | |
| | : | |
| **Debtors.** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

# O P I N I O N

## I.  INTRODUCTION

Before the Court is U.S. Bank Trust National Association's Objection to Confirmation of the Second Amended Chapter 13 Plan filed by Debtors Donald and Sharon Gurnari ("Debtors"). At the evidentiary hearing on this matter, the Court determined that Debtors failed to meet their burden as to the feasibility of their proposed plan and denied confirmation on that ground. However, also at issue is whether Debtors are permitted to bifurcate U.S. Bank's secured claim through their plan, and if so, what the value of that claim is. As explained more fully below, the Court determines that Debtors may cramdown the value of the claim and the value of the residence is $85,000.

## II.  PROCEDURAL POSTURE

Debtors filed a joint voluntary Chapter 13 Bankruptcy Petition on June 2, 2023. On the same day, Debtors filed their schedules, statements, and Chapter 13 Plan. *See* Dkt. # 1, 7. On Schedule A/B, Debtors listed their residence at 1025 Mount Vernon Avenue, Scranton, Pennsylvania ("Property") with a current value of $55,000. On Schedule D, Debtors listed a secured mortgage debt to Fay Servicing in the amount of $163,837.

U.S. Bank Trust National Association ("Bank or U.S. Bank") filed a proof of claim asserting a secured claim against the Property in the amount of $167,125.83 ("Claim"). *See* Amended Claim No. 9-2. The Bank left blank the line indicating a value for the Property but did indicate that the entire amount of the Claim was secured. Debtors have not objected to the Claim.

On January 29, 2024, Debtors filed their Second Amended Chapter 13 Plan ("Plan"). Dkt. # 35. U.S. Bank filed its objection ("Objection") on February 6, 2024. Dkt. # 38. The Chapter 13 Trustee ("Trustee") filed his Objection on February 7, 2024. Dkt. # 39.

The Trustee objected to confirmation of the Plan on the basis of feasibility. He argued that Debtors' Schedules I and J do not evidence that Debtors have sufficient income to support the current plan payment of $1,463.00. Furthermore, funding of the Plan is dependent upon a $1,000 monthly contribution from Debtors' tenant, which the Trustee argues is speculative. Therefore, the Trustee was not recommending confirmation and requested that confirmation of the Plan be denied.

After several continuances, the Court held an evidentiary hearing on the objections on June 6, 2024. Surprisingly, Debtors did not appear at the hearing to support their position. Debtors and U.S. Bank each had an appraiser testify as to the value of the Property. At the conclusion of the hearing, the Court denied confirmation of the Plan on the basis of feasibility but took the issues of cramdown of the Claim and valuation of the Property under advisement. The Court requested briefing on the legal issue. U.S. Bank filed its brief on June 13, 2024 and Debtors filed their brief on June 20, 2024. *See* Dkt. # 44 & 45. This matter is ready for decision.

## III.   JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334 and the Standing Order of Reference of the U.S. District Court for the Middle District of Pennsylvania dated March 11, 2016.   The pending matters are core proceedings pursuant to 28 U.S.C. §157(b)(2).   Venue is proper pursuant to 28 U.S.C. §1409(a).   This Opinion constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure 7052, which is applicable to contested matters pursuant to Fed. R. Bankr. P. 9014(c).

## IV.   FACTS

On April 29, 1999, Debtors executed a balloon note ("Note") in the principal amount of $53,600 secured by a mortgage ("Mortgage") against the Property.   *See* Amended Claim No. 9-2. The Note matured on April 29, 2014.   U.S. Bank is the current holder of the Note and Mortgage. As stated above, U.S. Bank filed its Claim with a secured debt in the amount of $167,125.83.

Debtors reside at the Property, which is located at 1025 Mount Vernon Ave., Scranton, Pennsylvania.   The Property is a duplex, which has separate units upstairs and downstairs, a full basement, two porches, a detached garage, and an above ground swimming pool.   Overall square footage of the home is 1632 square feet.   Debtors reside in the ground floor unit, which has two bedrooms, one bathroom, a kitchen, and a living room.   Debtors rent the second unit to a tenant. Their Schedules indicate a rental of $675 per month.   *See* Sch. G.   The upstairs unit has three bedrooms, one bathroom, a kitchen, and a laundry room.

From the hearing testimony and appraisals submitted, it is clear that there is overall wear and tear to the Property including the floors, walls, and ceiling.   There are boarded up windows and the garage is in poor condition.   There have been no updates to the home in over 15 years.

3

## V. THE PARTIES' POSITIONS

Debtors filed their Second Amended Plan which proposes to make monthly payments to the Trustee of $394 for 6 months, then $1,463.00 for 54 months. The total base amount under the Plan is $80,324. The Plan seeks to bifurcate U.S. Bank's secured claim under §506(a).[1] Debtors assert that the Property has a value of $55,000 and propose to pay that amount to U.S. Bank with 6% interest, for a total payment of $63,798.

Debtors cite to *In re Scarborough*, 461 F.3d 406 (3d Cir. 2006), as authority to cramdown the Property under their Plan. In *Scarborough*, the Third Circuit Court of Appeals determined that the mortgage debt which was secured by the debtor's multi-unit residence did not fall under the anti-modification provision of §1322(b)(2). The Third Circuit held that the real property must be exclusively the debtor's residence and since the debtor rented out part of the property, she was able to modify the secured debt in her Chapter 13 plan. *Id.* at 414.

Debtors however, failed to address the continued viability of *Scarborough's* holding. In 2005, Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act, Pub.L. 109–8, §306(c) (2005), which included new definitions of "debtor's principal residence" and "incidental property" which potentially affected the scope of §1322. *See Scarborough*, 461 F.3d at 412 n.2; *In re Wissel*, 619 B.R. 299, 301 (Bankr. D.N.J. 2020). The Third Circuit has not had occasion to revisit its holding in *Scarborough* to determine what, if any, effect the added definitions have on the anti-modification provision under §1322(b)(2). Some courts that have addressed the issue have concluded that the definitions have plainly expanded its scope. *See e.g.,*

---

[1] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. §101, *et seq.*, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("Bankruptcy Code").

4

*Lee v. U.S. Bank National Association*, 102 F.4th 1177, 1184-85 (11th Cir. 2024) (in context of §1123(b)); [2] *In re Pedicone*, 2021 WL 5496547, at *4 (Bankr. D. Del. 2021); *Wissel*, 619 B.R. at 301 (holding that definitions Congress added to Bankruptcy Code extend reach of §1123(b)(5)); *In re McDonald*, 2008 WL 2230073 (Bankr. W.D. Pa. 2008).

U.S. Bank objected to confirmation of the Plan asserting that the Plan is underfunded and does not propose to contribute funds sufficient to pay U.S. Bank's Claim in full. U.S. Bank asserts its claim is $167,125.83 plus 7.0% interest over the life of the plan. In its brief, U.S. Bank updated the total to $215,531.16. It further objected to the 6% interest rate the Plan proposes.[3] U.S. Bank also echoed the Trustee's feasibility objection.

The Bank also objected because the Plan improperly attempts to cramdown the secured claim. The Bank argued that pursuant to §1322(b)(2), Debtors may not modify the Claim because it is secured solely by real estate that is Debtors' primary residence. On this point, the Bank's main argument was that the Mortgage plainly states that it is secured by the real estate located at 1025 Mt. Vernon Ave. and does not identify any other real property that is secured by the instrument. The Bank acknowledged that the Mortgage includes as security "all the improvements, now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property," but argued that this other security is covered by the 2005 amendments and would be considered "incidental property" and the anti-modification provision still applies citing *Pedicone*, 2021 WL 5496547. The Bank however did not directly address the

---

[2] The language under §1123(b)(5) is identical to §1322(b)(2).

[3] The Court questioned U.S. Bank's Counsel regarding the discrepancy in the asserted interest rate. The Note indicates that it is fixed at 11.7%; the Claim asserts a variable rate at 7%; at the hearing, Counsel asserted that the interest rate was 10.5%. Counsel was unable to provide an explanation.

fact that *Scarborough* is factually on point with this case, even though the Bank cited *Scarborough* in its brief, *see* Bank's Brief at 2 (unpaginated).

## VI.    ANALYSIS

### A.    Debtors are Permitted to Cramdown

The general rule is that a secured claim may be separated under §506(a) into secured and unsecured portions. Debtors are proposing to address the default on the Mortgage under §1322(b)(3), which is a permissible part of a Chapter 13 plan. However, certain residential mortgages have significant protection under the Code which excepts these claims from the general rule. To wit, Section 1322(b)(2) provides:

> (b) Subject to subsections (a) and (c) of this section, the plan may -
>
> > (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ….

The issue here is whether Debtors' Mortgage can be crammed down pursuant to §1325(a)(5) or whether the anti-modification provision of §1322(b)(2) applies. Neither party identified §1322(c)(2), which is an exception to the exception to the general rule. It provides:

> (c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law--
>
> > (2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

Thus, Section 1322(c)(2) carves out a narrow subset of secured claims "where the last payment of a secured claim on the original payment schedule is due *before* the date on which the

6

final payment under a debtor's plan is due, *i.e. short term or matured debt.*" *In re Mendez*, 600 B.R. 321, 328 (Bankr. D.N.J. 2019) (emphasis in original) (citation omitted). For these claims, a debtor may cramdown the mortgage loan under §1325(a)(5)(B). *See In re Lewis*, 607 B.R. 539, 545 (Bankr. S.D. Miss. 2019). Because Debtors' Note and Mortgage matured prior to petition date, Debtors may utilize §1322(c)(2) to cramdown the Note and Mortgage. *See Id.*; *In re Golash*, 428 B.R. 189, 190 (Bankr. W.D. Pa. 2010).

Based on the above two options in this case, it is unnecessary to decide the legal issue of whether the Claim is "secured only by a security interest in real property that is the debtor's principal residence." If the Court determines that notwithstanding the 2005 amendments, the Property is a multi-unit residence and *Scarborough* applies (*i.e.*, the Property is not "secured only by a security interest in real property that is the debtor's principal residence"), Debtors would be permitted to cramdown the value because the anti-modification provision would not apply. If the Court determines that the 2005 amendments clarified and expanded the scope of the anti-modification provision, and concludes that the Property is "secured only by a security interest in real property that is the debtor's principal residence," Debtors would still be able to cramdown the value by operation of §1322(c)(2), because the Note and Mortgage matured before the filing of this bankruptcy case.[4] The result is the same under either scenario, and the Court will not engage in a needless exercise. Accordingly, the Court finds and concludes that Debtors are permitted to bifurcate U.S. Bank's secured Claim pursuant to §1325(a)(5).

Next, the Court will turn its focus to the valuation of the Property.

---

[4] The Bank's Proof of Claim attached the relevant Balloon Note dated April 29, 1999 which specifically set a maturity date of April 29, 2014 and the Mortgage indicating a maturity date of April 27, 2014 (the Court suspects that the 27th was a mistake and should have been the 29th). Accordingly, the Loan matured over ten (10) years ago and there was no evidence presented that it had been extended.

**B.    Valuation of the Property**

1.  Applicable Legal Principles

Section 506(a)(1) provides:

> (a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The United States Supreme Court in *Assocs. Com. Corp. v. Rash*, 520 U.S. 953 (1997), considered the question of what standard of valuation should be utilized when a debtor seeks to retain and use a creditor's collateral pursuant to a Chapter 13 plan.  The *Rash* Court determined that §506(a) directs the application of the replacement value standard when a debtor seeks to cram down the claim.  *Rash*, 520 U.S. at 960.  Replacement value is "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller."  *Id.* The *Rash* Court left to the Bankruptcy Court the task of identifying the best way of ascertaining replacement value.  *Id.* at 965 n. 6.  "Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property."  *Id.*

The Third Circuit Court of Appeals in *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012), held that a burden-shifting approach applies to valuations of collateral under §506(a).

The initial burden should be on the party challenging a secured claim's value, because "11 U.S.C. § 502(a) and Bankruptcy Rule 3001(f) grant *prima facie* effect to the validity and amount of a properly filed claim." It is only fair, then, that the party seeking to negate the presumptively valid amount of a secured claim—and thereby affect the rights of a creditor—bear the initial burden. If the movant establishes with sufficient evidence that the proof of claim overvalues a creditor's secured claim because the collateral is of insufficient value, the burden shifts. The creditor thereafter bears "the ultimate burden of persuasion ... to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim.

679 F.3d at 140 (internal citations omitted).  With these principles in mind, the Court considers the evidence presented by the parties.

### 2. The Appraisals

The parties stipulated that both appraisers are certified as experts.  Both appraisers submitted their written appraisals which were admitted at the close of testimony.  There was no objection as to admissibility of either appraisal.[5]

The Bank offered the testimony of Mr. Albert Read, IV who has been an appraiser for 18 years.  He performed an appraisal of the Property on February 12, 2024, using all three approaches (*i.e.*, the cost approach, sales comparison approach, and the income capitalization approach) to determine his assessment of value.

He testified that he researched the market and pulled comparable properties that he believed were as close to the Property as he could locate using both recent sales and listings.  He scanned

---

[5] At the conclusion of the June 6th hearing, U.S. Bank made the argument that Debtors' appraisal should be given less weight because it is more akin to a broker price opinion ("BPO") than an appraisal since the appraiser did not enter the Property.  The Bank cited *In re Thomas*, 344 B.R. 386, 393 (Bankr. W.D. Pa. 2006).

the properties available in the whole area, finding comps that were within 8 or 9 months to 4 months and all were in Scranton. He stated that he visited each of the six comps.

He further testified that he visited the Property and took photographs of inside and outside of Property while he was on the premises. The main issue about the Property that he immediately identified was that there were deferred maintenance issues. The areas he highlighted in his testimony included: the rear staircase was significantly deteriorated and would not pass inspection, many areas of the Property both interior and exterior have peeling paint, there are boarded up windows, and staining on ceiling tiles on the second floor which could indicate mold issues. He also pointed out the detached garage that is located on the Property is in poor condition, is falling down, and in his opinion should be razed. He testified that because of its condition, he assigned no value to the garage.

He testified that in his opinion $5,000 would need to be invested in the Property to bring the Property up to "average" condition. Otherwise, he opined that the Property was in "fair" condition at the time of his visit. Mr. Read testified that if the $5,000 was invested in repairs, he believed that the Property was worth $100,000 based upon the sales approach.[6] He stressed that the $5,000 adjustment had been made to the appraisal value and he believed that it was the only condition adjustment that was needed to arrive at the $100,000 value.

Mr. Read also testified that based on his analysis of the market, he believed that market conditions were increasing due, in part, to the current shortage of supply. His report concluded that northeastern Pennsylvania "is seeing its lowest inventory of homes in many years." U.S. Bank Appraisal at 3. He testified that two-unit properties have increased approximately 106% since the

---

[6] Mr. Read also opined that the value of the Property would be $112,500 using the income approach (based upon an estimate rental of $750 per unit per month) and $129,100 using the cost approach.

2020 pandemic. Furthermore, to provide some comparison to Debtors' appraisal, he testified that if he had performed his appraisal in June of 2023, his valuation would have been lower. He estimates that he would have assigned a value of approximately $15,000 less. The Court also notes that Mr. Read included a rental analysis in his report.

Debtors offered the testimony of Mr. Derek Define who has been an appraiser for 13 years and licensed for 5 years. He conducted his appraisal on June 9, 2023. Mr. Define used the sales comparison approach exclusively for his appraisal.

He utilized three comparable properties that were within the same zip code as the Property. All were within less than two miles of the Property. Because there were very few duplexes in "fair" condition, Mr. Define used two comps that were in "poor" condition and one that was in "average" condition.

He testified that at the time of his visit to the Property, he was unable to gain entry to the interior of the Property because the occupants of both units reportedly had CoVid-19. He was able to take an exterior measurement to determine the square footage of the Property.

Similar to Mr. Read's assessment, Debtors' appraiser believed the Property was in "fair" condition. He also identified the same deferred maintenance issues; however, at the time of his appraisal, the detached garage was in better condition. The roof had been patched but Mr. Define did not believe that the garage had to be razed.

As for housing market conditions, he believed that the market at the time of his appraisal was stable but he agreed with the Bank's appraiser that the market in February 2024 was increasing and that the value of the Property would be worth more now than in June 2023.

Based upon all of the above, Mr. Define assigned a value of $46,000 to the Property.

11

3. <u>Determination of Value</u>

Valuation of property for the purpose of plan confirmation is made as of the date of confirmation. *See In re Seidle*, 2013 WL 828303, at *3 (Bankr. M.D. Pa. 2013). As Judge France observed several years ago, "[r]eal estate valuations are matters of art more than science." *In re Hildreth*, 2011 WL 1332036 at *5 (Bankr. M.D. Pa. 2011). The Court believes that the value of the Property is closer to Mr. Read's appraisal; however, the condition issues appear to be more severe than Mr. Read opined. Judging from the photographs and the experts' testimony, more than $5,000 of repairs will need to be expended to bring the Property up to average condition.

In this case, the appraisers were fairly congruent as to the condition of the Property and the areas that were in need of repair. Despite this perceived agreement, they were far apart on value – $46,000 vs. $100,000. "When weighing conflicting appraisal testimony, courts generally evaluate a number of factors, including: the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented." *Seidle*, 2013 WL 828303, at *4 (citing *In re Smith*, 267 B.R. 568, 572-73 (Bankr. S.D. Ohio 2001)) (citations omitted). "A bankruptcy court is not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion of the value of the subject property after considering the appraisals and expert testimony." *Smith*, 267 B.R. at 572-73.

It is clear to the Court that the Bank's appraisal is more thorough and should be given greater weight in evaluating the value of the Property. In reviewing the appraisals, several factors support this finding:

12

1. Mr. Read has substantially more experience;

2. The Bank's appraisal was recently completed and Debtors' is over one year old;

3. Mr. Read employed all 3 approaches to his valuation (cost, sales and income) vs. only the sales approach by Mr. Define;

4. Mr. Read used 6 comparable properties vs. 3 by Mr. Define; and

5. Mr. Read testified that he visited each comparable but Mr. Define did not.

Significantly, Mr. Read testified that he also physically inspected each apartment at the Property and Mr. Define indicated that he was not able to gain access because the occupants had CoVid-19.[7] Further, as stated above, both appraisers agreed that the "Scranton market" for rental properties has increased since Mr. Define's report. Accordingly, Mr. Define's valuation is admittedly low.

Given all of these considerations, the Court will adopt Mr. Read's appraisal but will add an additional $10,000 to the $5,000 condition adjustment given the glaring condition deficiencies identified at the hearing. Therefore, the Court determines the fair market value of the Property is $85,000.

### 4. Interest Rate

Lastly, the parties were unable to agree on the applicable interest rate. A secured claim subject to modification under §1322(c)(2) may be restructured "at an interest rate more favorable to the debtor than the rate on the original note." *Golash*, 428 B.R. at 191 (quoting *In re Joyner*, 2008 WL 4346467, at *2 (Bankr. E.D.N.C. 2008)). Debtors proposed 6% in their Plan, while U.S.

---

[7] No explanation was given why Debtors own appraiser was not given access to the interior of the Property over the 1 year period since the appraisal and the hearing on this matter.

Bank advocated for 10.5%. Neither party provided any evidence regarding the appropriate risk adjustment.

Utilizing the formula approach endorsed by the United States Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. 465, 479 (2004), the Court determines that the applicable interest rate is the national prime rate (currently 8.5%) plus 2%, which totals 10.5%. Because the Court determined at the hearing that there are feasibility issues, the Court accepts the interest rate of 10.5% proposed by U.S. Bank.

## VII.    CONCLUSION

For the reasons stated above, the Court determines that Debtors are permitted to bifurcate U.S. Bank's secured claim pursuant to §1325(a)(5). Further, the Court determines that the value of the Property for purposes of confirmation is $85,000 and 10.5% is the appropriate interest rate.

Accordingly, the Court grants Debtors leave to amend their Chapter 13 Plan **on or before August 16, 2024.**[8] An appropriate order will be entered.

By the Court,

_____
Mark J. Conway, Bankruptcy Judge
Dated: July 31, 2024

---

[8] At the June 6th hearing, the Court reserved decision on whether to allow Debtors leave to file an amended plan. Based on the Court's determination that Debtors are permitted to bifurcate the secured claim, it is appropriate in this instance to grant Debtors another opportunity to propose a feasible plan.

14